UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **AMBER SMITH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **RACHELLE E. MORGAN; and** ) | Civil Action Number |
| **CENTER HILL ENTERPRISES,** ) | **5:18-cv-01111-AKK** |
| **LLC,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

Plaintiff Amber Smith, who is deaf, claims that a local store refused to serve her unless she presented proof that her dog was a service animal. Amber brings this action against Center Hill Enterprises, LLC (the store) and Rachelle Wilson (the manager and majority-owner of the store)[1], alleging violations of Title III of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12181 *et seq.*, as well as a tort of outrage against the store.[2] Doc. 1. The defendants move for summary judgment of the claims against them. Docs. 49, 53.

---

[1] The complaint names Rachelle E. Morgan, but her last name has since changed to Wilson. Wilson argues that she cannot be individually liable for the ADA claims. The ADA states that "[n]o individual shall be discriminated against on the basis of disability . . . by *any person* who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a) (emphasis added). Wilson is the sixty-percent owner of the store. Doc. 51-4 at 4. She may thus be liable under the ADA as an owner of a place of public accommodation.

[2] Amber elected to drop her other state-law claims. Doc. 61 at 11; doc. 63 at 10–11.

1

There is no question, and the defendants do not dispute, that they violated the ADA. The law is clear that a "public accommodation shall not require documentation [for a service animal], such as proof that the animal has been certified, trained, or licensed as a service animal." 28 C.F.R. § 36.302(c)(6). The public accommodation may ask only two limited questions: "if the animal is required because of a disability and what work or task the animal has been trained to perform." *Id.* The defendants were unfamiliar with these rules when they demanded documentation for Amber's service animal. After learning the law, the defendants have changed their policy to allow service animals in the store without proof and have advised their employees accordingly. As a result, the defendants say Amber's ADA claims are moot. The court holds that the defendants' voluntary cessation of the challenged conduct does not moot Amber's ADA claims, but that the defendants are nevertheless entitled to summary judgment because Amber has not established that she is entitled to relief. The defendants are also entitled to summary judgment on the tort of outrage.

**I.**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party.

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). To defeat a motion for summary judgment, the non-moving party must supply enough evidence so "that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

## II.

On May 4, 2017, Amber stopped at an Exxon gas station in Hanceville, Alabama with her husband, Chad Smith, and their two kids. The Smiths regularly stop at the Hanceville Exxon when they visit Chad's parents in the area. Chad and the kids entered the store first. Amber followed a few minutes later with her service dog, Sassy.

A store employee quickly approached Amber and told her that dogs were not allowed in the store. Doc. 51-2 at 6. Amber, of course, could not understand the employee. Chad intervened and explained to the employee that Amber was deaf and that she used Sassy as her service dog. *Id.* The employee then demanded proof that Sassy was a service dog, to which Chad responded that it is unlawful to request a service animal's papers. *Id.* At that point, the employee "got made and stormed off." *Id.*

The employee went to consult with another employee—Ashleigh Chaffin. Doc. 51-3 at 4. Chaffin says she had a conversation with Chad too, *id.* at 5, but Chad does not remember this conversation, doc. 51-2 at 6. According to Chaffin, she

3

asked Chad if he had papers to prove that Sassy was a service animal, to which Chad again replied that it was unlawful to ask for a service dog's documentation.[3]  Doc. 51-3 at 5.  Chaffin told Chad she was going to call the police for "clarification."  *Id.*[4]

After Chaffin announced that she was calling the police, Amber and Chad approached the counter to purchase a few items from the store.  Doc. 51-2 at 7.  When Amber and Chad tried to pay, however, Chaffin allegedly told the cashier: "We're not selling them anything.  Don't sell them nothing."  *Id.* at 8.  Amber and Chad waited at the counter until the police arrived.  *Id.*

Three police officers responded to the call.  Doc. 51-1 at 6.  Like the employees, the police questioned whether Sassy was a service animal, and asked to see documentation.  Doc. 51-2 at 10.  Again, Chad responded that it is unlawful to ask to see documentation for a service animal.  *Id.*  The police decided to call the city attorney.  *Id.* at 11; doc. 51-3 at 10.

---

[3] In her deposition, Chaffin insists that neither she nor the first employee would have asked to *see* Sassy's papers; they would have asked only if Sassy *had* papers.  Doc. 51-3 at 5, 8.  That is not how Chad remembers it; he specifically remembers that the first employee wanted to see Sassy's papers.  Doc. 51-2 at 6.  On a motion for summary judgment, Chad's memory governs.  Either way, the question was unlawful.  *See* 28 C.F.R. § 36.302(c)(6).

[4] In a declaration, Chaffin elaborates on her decision to call the police: "[I]t was not clear to me at the time how I was to determine if the animal was a service animal without some documentation, and I did not want to violate any health department regulations concerning the presence of animals in establishments that serve food."  Doc. 51-7 at 3.

4

According to Chad, the city attorney advised that the store was allowed to ask to see Sassy's papers, and the Smiths had to produce those papers.[5] Doc. 51-2 at 12. At that point, Amber showed the police a certificate from a website that said Sassy was a service animal. *Id.* Even after producing the certificate, the police forced Amber and Sassy to stay with them by the front of the store while Chad paid for their items. *Id.* The Smiths then left the store. The Smiths intend to return to the store, because it is the most convenient gas station when they visit Chad's parents, but they have not yet done so. *Id.* at 13–14.

Wilson, the manager and majority-owner of the store, claims that "[i]mmediately after the Smiths left," she looked up the law about service animals and learned that businesses "could not ask for proof that animals brought into the store were service animals." Doc. 51-6 at 4.

The Smiths promptly retained counsel, and one week after the incident they mailed a notice to preserve evidence to the defendants. Doc. 51-3 at 21. After receiving this notice, Wilson posted a sign on the store window reading, "Service Animals Welcome." Doc. 51-4 at 5; doc. 51-3 at 10. She also printed a summary from the Department of Justice ("DOJ") of the rules regarding service animals, and

---

[5] Wilson recalls that the city attorney (correctly) advised them that they could not ask for proof of a service animal. Doc. 51-4 at 9. This would be a devastating confession, since they continued to seek proof that Sassy was a service animal after receiving the city attorney's advice. *See* doc. 51-3 at 7.

5

placed it near the register. Doc. 51-4 at 6; Doc. 51-3 at 23–25. Furthermore, Wilson required the store's employees to sign an agreement indicating that they had reviewed the DOJ's summary. Doc. 51-4 at 13; doc. 51-6 at 14–28 (showing that the first employee signatures occurred on May 22, 2017).[6]

Since the incident with the Smiths, the defendants say several customers have brought animals to the store. Wilson remembers a customer who had a puppy in her purse, whom Wilson served without raising an issue. Doc. 51-4 at 13. Chaffin recalls three customers who brought puppies to the store, and she asked the customers to take the puppies outside because the store was serving food and the puppies could not "possibly be service animals." Doc. 51-8 at 3; doc. 51-3 at 9. Chaffin says that another three customers brought service animals to the store. Doc. 51-8 at 3. Each time, Chaffin asked the customers "if the animal was a service animal[, and] when they responded affirmatively, the animals were allowed in with no further discussion." *Id.* "In one case, another customer . . . complained that [the] animal did not have a vest on it," and Chaffin "explained to the customer that there was no need for a vest under federal law." *Id.*

---

[6] Also on May 22, two of the officers who responded to the scene drafted statements memorializing their memory of the incident. Doc. 51-4 at 20–21. Either Wilson or Chaffin asked the officers to draft the statements. *See* doc. 51-3 at 10. The timing of the officers' statements further corroborates that the defendants sprang into action after they received notice of legal action.

Amber filed this lawsuit, alleging violations of the ADA and various state-law claims. Doc. 1. The defendants moved to dismiss the ADA claims, arguing that because they had changed their policy to comply with the law, the ADA claims were moot. Doc. 17. The court denied the motion without prejudice, finding that the defendants had not provided enough facts to establish that the ADA claims were moot. Doc. 34. The defendants now move for summary judgment. Docs. 49, 53.

## III.

With the benefit of discovery, the defendants renew their contention that the ADA claims against them are moot. The defendants also maintain that they are entitled to summary judgment on the tort of outrage. The court will consider each issue in turn.

### A.

A case is moot "when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Troiano v. Supervisor of Elections in Palm Beach Cty.*, 382 F.3d 1276, 1282 (11th Cir. 2004). As relief for her ADA claims, Amber asks the court for a declaratory judgment, stating that the defendants violated the ADA, and for an injunction, ordering the defendants "to modify their policies and practices to be consistent with" the ADA and "to provide [her] full and equal use and access to the" store. Doc. 1 at 31. She does not seek monetary relief. *See Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1329 (11th Cir. 2013)

7

(finding that monetary relief is not available to plaintiffs suing under Title III of the ADA). The defendants say they have already changed their policies to comply with the ADA, and that Amber and Sassy would be welcome in the store. Consequently, the defendants argue that they have already provided the relief that Amber seeks.

However, it does not usually moot a case when a defendant voluntarily ceases the challenged conduct. *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953). Otherwise, defendants could easily avoid litigation while remaining "free to return to [their] old ways." *Id.* Thus, it is not enough to moot a case for a defendant to tell "the court that the [challenged conduct] no longer exists and disclaim any intention to revive" the practice. *Id.* at 633. Instead, voluntary cessation will moot a case only if the defendant meets the "heavy burden" of showing that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000). The "mere possibility" of recurrence is enough "to keep the case alive." *W.T. Grant Co.*, 345 U.S. at 633.

The issue thus turns on the probability of recurrence. To help predict this probability, the Eleventh Circuit has identified "at least" three factors: "(1) whether the challenged conduct was isolated or unintentional, as opposed to a continuing and deliberate practice; (2) whether the defendant's cessation of the offending conduct was motivated by a genuine change of heart or time to anticipate suit; and (3)

8

whether, in ceasing the conduct, the defendant has acknowledged liability." *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1184 (11th Cir. 2007).

The first factor—whether the challenged conduct was isolated and unintentional, or continuing and deliberate—cuts both ways. The defendants admit that they asked customers with service animals for documentation in the past, doc. 51-3 at 9, but at the time the defendants did not know the ADA prohibited asking such questions, *id.* at 11; doc. 51-4 at 6. In short, the challenged conduct was continuing but unintentional.

The second factor—whether the cessation was genuine or timed to anticipate a suit—cuts against the defendants. The defendants claim that they "[i]mmediately" researched the law after the Smiths left the store. Doc. 51-6 at 4. But the evidence shows that it was not until after the defendants received notice of a potential lawsuit that they posted the sign welcoming service animals and required employees to sign an agreement acknowledging familiarity with the rules concerning service animals. Doc. 51-3 at 10, 21; doc. 51-4 at 5, 13; doc. 51-6 at 14–28. The court thus concludes that the defendants' actions were motivated by the impending lawsuit, and "reform timed to anticipate or blunt the force of a lawsuit offers insufficient assurance that the practice sought to be enjoined will not be repeated." *NAACP v. City of Evergreen*, 693 F.2d 1367, 1370 (11th Cir. 1982).

The third factor—whether the defendants acknowledge liability—favors the defendants. Amber argues that the defendants should not get credit for acknowledging liability, since they dispute parts of her version of events, such as her claim that the defendants did not allow her to shop or move around the store. Doc. 51-5 at 4. But "[m]ootness turns primarily on future threats, not upon penance." *Adams v. Bowater Inc.*, 313 F.3d 611, 615 (1st Cir. 2002). The defendants unmistakably concede that they cannot ask for documentation of a service animal, and that they must provide disabled persons with full and equal access to their store, giving the court little reason to fear future injury.

Having marched through the factors without reaching a conclusive result—as is so often the case with multi-factor tests—the court returns to the central question: whether the defendants have made it "absolutely clear" that asking for a service animal's papers "could not reasonably be expected to recur." *Friends of the Earth,* 528 U.S. at 189. The court finds that the defendants have not satisfied this "formidable burden." *Id.* at 190. The main bulwark against recurrence is the requirement that new employees read DOJ's summary of the law regarding service animals. *See* doc. 51-3 at 23–25. This is hardly foolproof. The defendants testified that there is a lot of turnover among the store's employees. Doc. 51-5 at 5–6. All it takes for this bulwark to fail is one new employee who falsely claims to have read the summary, or whom the store forgets to tell about the policy. After all, the

10

defendants have consistently argued that most people have no idea you cannot ask to see a service animal's papers. The defendants could also grow weary of the policy and simply revert to their old practice. This, of course, is why telling "the court that the [challenged conduct] no longer exists and disclaim[ing] any intention to revive" the practice is not enough to moot a case. *W.T. Grant Co.*, 345 U.S. at 632. Accordingly, the court finds that Amber's ADA claims are not moot.

  This does not end the analysis, however. Though the case presents a justiciable controversy, and the defendants concede they violated the ADA by asking for Sassy's papers, the question remains whether Amber is entitled to any relief. Amber must show "by a preponderance of the evidence" that an injunction is "necessary." *Sheely*, 505 F.3d at 1182 n.10. Specifically, Amber must establish "that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *W.T. Grant Co.*, 345 U.S. at 633. Thus, the threat of future injury required for an injunction is greater than the threat required to overcome mootness. And unlike the mootness issue, the plaintiff bears the burden on the question of relief. *See United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1358 (11th Cir. 2019) ("Because [the standard for mootness due to voluntary cessation and the standard for granting injunctive relief] are strikingly different—both as to who bears the burden and as to

what that burden is—it follows that even though a case is not moot, that does not mean that injunctive relief follows automatically.") (citation omitted).

Amber has not met this burden. Even viewed in the light most favorable to her, the evidence shows that the defendants violated the ADA unknowingly—they did not know that they could not ask for Sassy's papers. Now that they know the law, the evidence indicates that the defendants intend to respect the law regarding service animals going forward. And Amber has not presented any evidence challenging the defendants' evidence that they have followed the law since their encounter with the her. Were the court to issue an injunction, it would not order the defendants to do more than they are already doing. As such, the court finds that an injunction is not necessary.[7]

## B.

Amber alleges that the defendants committed the tort of outrage against her when they refused to serve her with her service animal and called the police on her. Under Alabama law, to prevail on the tort of outrage, the plaintiff must show that "the conduct was extreme and outrageous." *Hill v. Cundiff*, 797 F.3d 948, 983 (11th

---

[7] The ADA claims are not saved by Amber's request for a declaratory judgment. As declaratory relief is prospective, a plaintiff seeking declaratory relief must show a sufficient likelihood that she will be affected by the allegedly unlawful conduct in the future. *McGee v. Solicitor Gen. of Richmond Cty.*, 727 F.3d 1322, 1325 (11th Cir. 2013). The analysis for whether a declaratory judgment is warranted is thus the same as the analysis for the injunction. After all, courts "are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998).

Cir. 2015). To qualify, the conduct must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *American Road Serv. Co. v. Inmon*, 394 So. 2d 361, 365 (Ala. 1980). Here, the alleged conduct plainly falls short of that standard. *See Franklin v. Chick-fil-A, Inc.*, 2006 WL 8436867 at *3 (N.D. Ala. 2006) (holding that kicking out a customer with a service animal with the assistance of police was not sufficient to state a claim for outrage). The defendants' motion for summary judgment on the outrage claim is thus due to be granted.

## IV.

The defendants' motions for summary judgment are due to be, and will be, granted by a separated order.

**DONE** the 21st day of July, 2020.

                                            **ABDUL K. KALLON**
                                            UNITED STATES DISTRICT JUDGE